**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

DAVID TROY,

Civ. No.  23-2961 (JRT/SGE)

Plaintiffs,

v.

GRAND RIVER NAVIGATION,

**MEMORANDUM OPINION AND ORDER**
Defendant, Cross-   **ON MOTIONS FOR SUMMARY**
Claimant, and Cross-   **JUDGMENT**
Defendant;

WISCONSIN CENTRAL LTD.,

Defendant, Cross-
Claimant, and Cross-
Defendant.

Laura De La Cruz and Matthew D. Shaffer, **SCHECTER SHAFFER & HARRIS LLP**, 3200 Travis Street, Floor 3, Houston, TX 77006; Michael A. Bryant, **BRADSHAW & BRYANT PLLC**, 1505 Division Street, Waite Park, MN 56387, for Plaintiff David Troy.

Anne St. Amaant and Vince C. Reuter, **ECKLAND & BLANDO**, 800 Lumber Exchange Building, 10 South Fifth Street, Minneapolis, MN 55402, for Defendant Grand River Navigation.

Timothy K. Masterson, **DONNA LAW FIRM, P.C.**, 7601 France Avenue South, Suite 350, Minneapolis, MN 55435, Defendant for Wisconsin Central Ltd.

In early January 2023, Plaintiff David Troy, a second mate on an ore carrier, slipped

and fell on a dock owned by Defendant Wisconsin Central Ltd.  ("WCL") as he approached

a vessel owned by Defendant Grand River Navigation ("Grand River") in Duluth,

Minnesota.  Troy initiated this action against Grand River and WCL (collectively, "Defendants") seeking damages related to his injuries.  Troy asserts claims against (1) Grand River for negligence under the Jones Act and for maintenance and cure and (2) WCL for negligence, premises liability, and for breach of the implied warranty of workmanlike service.  WCL and Grand River bring crossclaims against each other seeking contribution and indemnity.  Defendants now move for summary judgment.  **First**, Grand River moves for summary judgment on its crossclaim for indemnity against WCL under *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co.*, 350 U.S. 124 (1956) (also known as *Ryan* indemnity).  **Second**, WCL moves for summary judgment on all claims filed against it.[1]

After careful consideration of relevant legal principles and record evidence, the Court will deny Grand River's summary judgment motion.  As to WCL's summary judgment motion, the Court will grant the motion in part and deny it in part.  The Court will grant WCL's motion as to Troy's claim that WCL breached the implied warranty of workmanlike service and to Grand River's crossclaim against WCL seeking *Ryan* indemnity.  The Court will deny WCL's summary judgment motion in part because WCL is not entitled to summary judgment on Troy's negligence and premises liability claims.  Nor is WCL entitled to summary judgment on Grand River's contribution claim—or Grand River's indemnity claim to the extent it is based on a theory other than *Ryan* indemnity.

---

[1] WCL does not move for summary judgment on its own crossclaim against Grand River for contribution and indemnity.

**BACKGROUND**

**I.      FACTUAL BACKGROUND**

David Troy served as a second mate on the *Defiance* (a tug) and the *Ashtabula* (a barge) (collectively, the "*Ashtabula*").[2]  (Troy Dep. at 36, 51, 184.)[3]  Grand River employed Troy and operated the *Ashtabula*.  (*Id.* at 36; Lees Dep. at 9–10.)  On January 3, 2023, while reporting for duty aboard a vessel owned by Grand River, Troy slipped and fell on taconite pellets that covered WCL's ore dock.

The Court will first summarize the events prior to Troy's arrival at the ore dock on the day of Troy's injury and then describe what happened upon Troy's arrival.

**A.      The *Ashtabula* Arrives at WCL's Dock in Duluth, Minnesota**

At approximately 4:30 a.m. on January 3, 2023, the *Ashtabula* arrived at WCL's ore dock in Duluth, Minnesota.  (Lees Dep. at 13.)  An ore dock is equipped with machinery used to load cargo such as taconite pellets onto the ships.  (Troy Dep. at 64–65, 179; Brewer Dep. at 15.)  Even though WCL owned the dock, Grand River's crew was responsible for loading operations.  (Brewer Dep. at 31–32.)  It is undisputed that WCL

---

[2] The tug is the power for moving the barge, and they are connected in a way that they are essentially just a single ship.  (*See* Troy Dep. at 51–52.)

[3] The parties rely on excerpts from six depositions submitted across several declarations. For clarity, a chart specifying each deposition and the page ranges of the excerpts included with each declaration is attached as an Appendix.

and Grand River were not parties to a written contract.  (Decl. of Timothy Masterson ¶ 2, Exs. F, G, May 30, 2025, Docket No. 60.)

When the *Ashtabula* arrived, Jayrome Rimolde, a control operator for WCL, was sweeping the dock because another vessel, the *Arthur Anderson*, had completed loading ore and departed earlier that morning.  (Decl. of Jayrome Rimolde ("Rimolde Decl.") ¶ 2, May 30, 2025, Docket No. 61; Brewer Dep. at 30.)  To sweep the dock, Rimolde used a "skidsteer-type vehicle" equipped with a brush and several lights on the front, roof, and rear of the vehicle.  (Rimolde Decl. ¶ 3.)  He expected the *Ashtabula* crew to easily see his vehicle because the vehicle's lights were activated, and it was moving back and forth on the dock.  (*Id.* ¶ 4.)

There is no evidence that anyone on the *Ashtabula* checked in with WCL to ask whether more time was needed to clean the dock before arrival.  (Lees Dep. at 35.)  Nor is there any evidence that anyone from WCL contacted the *Ashtabula* crew to inform them that it was unsafe to moor, even though vessels, such as the *Ashtabula*, may not dock without WCL's permission.  (Brewer Dep. at 42, 46, 76.)  WCL's dock foreman was responsible for communicating with arriving vessels.  (*Id.* at 34.)

Despite Rimolde's ongoing cleanup, the *Ashtabula* pulled up to the dock.  (Rimolde Decl. ¶ 5.)  Rimolde asserted that he stopped sweeping because the vehicle must exit the dock before a ship attaches to the dock with its "lines."  (*Id.*)  WCL's dock foreman, George Brewer, confirmed that Rimolde informed him that he could not finish sweeping due to

the *Ashtabula*'s arrival, though Brewer could not recall whether that conversation occurred before or after Troy's injury.  (Brewer Dep. at 38, 42.)

WCL's port manager, Louis Weichseldorfer, confirmed that dock had "not yet [been cleaned] in the area of the incident."  (Weichseldorfer Dep. at 29; *see also* Decl. of Laura B. De La Cruz ("De La Cruz Decl.") ¶ 6, Ex. E, June 20, 2025, Docket No. 68 (email from Weichseldorfer shortly after Troy's injury indicating that some cleaning of the dock "was performed, but not yet in the area of the incident").)  Weichseldorfer acknowledged that WCL "has an obligation to maintain its dock facility in a reasonably safe condition[.]" (Weichseldorfer Dep. at 16.)  WCL policy required that dock aprons be cleaned before each vessel's arrival; in fact, the policy stated that vessels, in most circumstances, should not be allowed to moor until the dock has been cleaned.  (Weichseldorfer Dep. at 19–20.) Weichseldorfer further testified that WCL personnel were responsible for warning ship crews about unsafe conditions and that he was not aware of any such warning being given to the *Ashtabula* crew, or Troy, on January 3, 2023.  (*Id.* at 44–45.)  Weichseldorfer agreed that there should have been additional communication between dock personnel and the *Ashtabula* regarding the dock's condition.   (*Id.* at 45.)

WCL's dock features an elevated catwalk system, which enables workers to travel the full length of the dock without walking on the dock surface.  (Johnson Dep. at 77–78.) The workers are trained to refrain from walking under loading shuttle/chutes because material being loaded onto the ship, such as taconite, could fall and hit workers.  (Kahn

Dep. at 28–29.)  Though not necessarily mentioned in any training materials, the falling material could create a walking hazard on the dock.  (*Id.* at 29.)  Troy testified that he did not recall anybody advising him that this catwalk existed.  (Troy Dep. at 122–23.)

### B.    Troy's Incident

When Troy arrived at the facility, he asked a security guard for instructions on how to access the ship.  (Troy Dep. at 69.)  The security guard was employed by General Security Services Corporation, a company hired by WCL to provide security services. (Decl. of Allen Edberg, June 7, 2025, Docket No. 74.)  The security guard simply instructed Troy "to walk toward the vessel," and Troy did not request further direction.  (Troy Dep. at 69, 91.)  As Troy walked toward the *Ashtabula*, he noticed that the path was covered with "piles" and "single layers" of taconite pellets.  (*Id.* at 84–85, 105.)  He recalled encountering pellets as soon as he passed beneath a unit/structure.  (*Id.* at 83–84.) Although he did not recall observing a shuttle or chute overhead, he did recall seeing pellets falling.  (*Id.* at 132.)

Troy testified that he moved cautiously, "carefully paying attention to how [he] was placing [his] feet due to so much ore and clutter" but that it was difficult to do so because of "the time of day and the lighting."  (Troy Dep. at 84.)  Troy noted "[t]here was no lighting for [him] to actually see." (*Id.* at 103.)  Nor was there any signage at the dock to guide Troy to the vessel.  (*Id.* at 218–19.)  Troy described the surface as feeling like "walking on marbles," with the pellets "rolling underneath [his] feet."  (*Id.* at 107.)

Troy ultimately slipped and fell on the dock, approximately twenty feet from the boat.  (Brewer Dep. at 20.)  As he laid injured on the dock, he overheard a nearby dock worker on a hand-held radio say that "they were supposed to clean the dock, but they had not."  (Troy Dep. at 117.)  One of the paramedics who responded commented that the walking conditions were "terrible" and that "they were having a hard time getting to [Troy]."  (*Id.* at 118.)

The *Ashtabula*'s captain, Kevin Lees, responded to the scene.  (Lees Dep. at 21.)  He observed the large amounts of taconite pellets, which he believed should have been swept.  (*Id.* at 22, 26.)  Although Lees could not determine the dock's condition at the time of the fall because pellets were falling when he arrived, he believed the dock was unsafe when he arrived.  (*Id.* at 28.)  Similarly, WCL's dock foreman, George Brewer, also testified that he believed that loading operations were occurring when Troy slipped and fell.  (Brewer Dep. at 21.)

## II.   PROCEDURAL HISTORY

Troy initiated this action against Grand River and WCL.  (Compl., Sept. 25, 2023, Docket No. 1.)  Troy brings claims against Grand River for (1) negligence under the Jones

Act[4] and (2) for maintenance and cure.[5] (Am. Compl. ¶¶ 1, 14–20, Jan. 21, 2025, Docket No. 50.) Troy also raises claims against WCL for negligence, premises liability, and for breach of implied warranty of workmanlike service. (*Id.* ¶¶ 21–34.) WCL and Grand River bring crossclaims against each other seeking contribution and indemnity. (WCL's Answer ¶¶ 42–43, Oct. 26, 2023, Docket No. 9; Grand River's Answer at 8–9, Dec. 14, 2023, Docket No. 14.)

Defendants now move for summary judgment. Grand River moves for summary judgment on its crossclaim for indemnity against WCL. (Grand River's Mot. Summ. J., May 30, 2025, Docket No. 53.) WCL moves for summary judgment on all claims filed against it (by Grand River and by Troy). (WCL's Mot. Summ. J., May 30, 2025, Docket No. 58.)

---

[4] "A Jones Act claim is an *in personam* action for a seaman who suffers injury in the course of employment due to negligence of his employer, the vessel owner, or crew members." *Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438, 441 (2001). The Jones Act provides that "[a] seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104. A Jones Act claim has four elements: (1) an employer's duty to provide a safe work environment to its seamen, (2) breach of that duty, (3) the employer's awareness of the unsafe condition, and (4) a causal link, however slight, between the breach and the seaman's injury. *Ribitzki v. Canmar Reading & Bates, Ltd.*, 111 F.3d 658, 662–64 (9th Cir. 1997).

[5] A maintenance and cure claim "concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001). Because the shipowner duty to pay maintenance and cure is distinct from the shipowner's liability under the Jones Act, "a seaman is entitled to 'maintenance and cure' payments **in addition** to any damages for negligence he or she might win under the Jones Act." *Stanislawski v. Upper River Servs., Inc.*, 6 F.3d 537, 540 (8th Cir. 1993) (emphasis added).

**DISCUSSION**

## I.   STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.   THRESHOLD ISSUES

Although the parties agree that the Court may exercise jurisdiction over this case, the parties dispute which statutory provisions confer such jurisdiction and, thus, whether state or maritime law applies.

The parties do not dispute that Troy's Jones Act negligence claim and maintenance and cure claim against Grand River fall within the Court's admiralty jurisdiction.  The parties also do not dispute that Troy's implied warranty claim against WCL falls under the Court's admiralty jurisdiction.

Troy asserts that the Court has original jurisdiction over all of his claims pursuant to the Court's admiralty or maritime jurisdiction under 28 U.S.C. § 1333(1).[6]  But WCL argues the Court must exercise supplemental jurisdiction over Troy's negligence and premises liability claims against WCL under 28 U.S.C. § 1367(a).  Because of this dispute, the parties likewise dispute whether maritime law or state law applies to Troy's negligence and premises liability claims against WCL.

### A.    Jurisdiction

The judicial power extends "to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2.  Congress codified this power in 28 U.S.C. § 1333(1), which provides that "district courts shall have original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."  When at least one claim falls within the Court's admiralty jurisdiction, the Court may also exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over any related claims that form part of the same case or controversy.

In 1948, Congress enacted the Admiralty Extension Act (AEA), which extended admiralty and maritime jurisdiction to "cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or

---

[6] Troy argues, in the alternative, that the Court may exercise supplemental jurisdiction over his claims against WCL under 28 U.S.C. § 1367(a).

consummated on land." 46 U.S.C. § 30101(a). "The purpose of the Act was to end concern over the sometimes confusing line between land and water, by investing admiralty with jurisdiction over 'all cases' where the injury was caused by a ship or other vessel on navigable water, even if such injury occurred on land." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 532 (1995).

Following the Act, the Supreme Court issued a series of decisions clarifying the scope of admiralty jurisdiction, culminating in *Grubart*, which set forth the current test for establishing federal admiralty jurisdiction under 28 U.S.C. § 1333(1). To satisfy § 1333(1), a party must satisfy the (1) location test and (2) the maritime connection test. *Grubart*, 513 U.S. at 534. To satisfy the location test, the plaintiff must show that either "the tort occurred on navigable water," or if the injury occurred on land, the harm "was caused by a vessel on navigable water." *Id.* To satisfy the maritime connection test, the plaintiff must show that the matter has "a potentially disruptive impact on maritime commerce" and that the "general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* (internal quotation marks and citations omitted).

Troy argues that maritime jurisdiction applies to his negligence and premises liability claims against WCL. But WCL argues that the Court should not exercise maritime jurisdiction over those claims because Troy was injured on a dock—an extension of land. Because Troy was injured on land, WCL asserts that Court should instead exercise

supplemental jurisdiction over these claims under 28 U.S.C § 1367.  The Court agrees with WCL and concludes that it will exercise supplemental jurisdiction over these claims for two reasons.

**First**, Troy's negligence and premises liability against WCL are against the dock owner—not Grand River, the owner of the vessel.  The plain text of 46 U.S.C. § 30101(a) extends admiralty and maritime jurisdiction to only "cases of injury or damage . . . **caused by a vessel** on navigable waters."  46 U.S.C. § 30101(a) (emphasis added).  Because Troy's negligence and premises liability claims are lodged against WCL, the dock owner, the AEA does not confer admiralty jurisdiction over those claims.

The case cited by Troy, *Duluth Superior Excursions, Inc. v. Makela*, 623 F.2d 1251 (8th Cir. 1980), supports the conclusion that Troy's negligence and premises liability claims are not covered by the AEA.  In *Mekela*, the plaintiff asserted claims against the vessel owners and operators after being injured on land.  *Id.* at 1252.  The Eighth Circuit concluded that in light of the Admiralty Extension Act, admiralty jurisdiction existed.  *Id.* at 1253.  Unlike the plaintiff in *Makela*, Troy's negligence and premises liability claims against WCL are asserted against the dock owner, not the vessel's owner or operator.  *Contra id.* ("It is sufficient for purposes of admiralty jurisdiction in this case that a passenger is suing for personal injuries allegedly due to the negligence of the vessel's owners and crew on navigable waters.").  The AEA therefore does not apply.

**Second**, Troy was injured on a dock, not navigable waters.  It is well-established the "[p]iers and docks [have been] consistently deemed extensions of land" and thus injuries that occur on them are "not compensable under the maritime law."  *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 206–07 (1971) (holding that no admiralty jurisdiction existed when a longshoreman was injured while operating a forklift to move cargo to a location on the pier where it was to be loaded onto a vessel).  To invoke maritime jurisdiction under the AEA, injury must be "caused by an appurtenance of a ship" or the ship itself.  *Id.* at 211.  Here, Troy was injured on a dock, an extension of land and is not alleging that those injuries were caused by an appurtenance of the ship or the ship itself. The AEA therefore does not apply.  *See, e.g.*, *Adamson v. Port of Bellingham*, 907 F.3d 1122, 1132 (9th Cir. 2018) (holding that maritime jurisdiction did not extend to an injury sustained by a crew member on a permanent passenger ramp connecting a port terminal building to a ferry); *MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 141, 142 (2d. Cir. 2011) (concluding that no maritime jurisdiction existed where ship passenger slipped and fell on a ramp linking the marina to the floating dock used by passengers to reach the vessel).

Because Troy's negligence and premises liability claims fail the location test, the Court may not exercise maritime jurisdiction over those claims under 28 U.S.C. § 1333(1). But these claims easily fall under the Court's supplemental jurisdiction under 28 U.S.C. § 1367 because Troy's claims share a "common nucleus of operative fact" with his claims

-13-

that do fall under the Court's admiralty jurisdiction See *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

### B.      Choice of Law

Troy argues that substantive maritime law should apply to all of his claims because he asserts claims under admiralty jurisdiction.  WCL argues that Troy's argument fails with respect to his negligence and premises liability claims because he is improperly lumping all of his claims into a single jurisdictional analysis.

Federal maritime law applies if the claim falls within the Court's maritime jurisdiction.  *E. River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864 (1986).  Put another way, "if Plaintiff's claims fall within maritime jurisdiction, then substantive maritime law controls; if they do not, however, then the court must apply other substantive law."[7] *Espinoza v. Princess Cruise Lines, Ltd.*, 581 F. Supp. 3d 1201, 1210 (C.D. Cal. 2022) (citing *Adamson*, 907 F.3d at 1126).

Because the Court concludes that Troy's claims for negligence and premises liability against WCL do not fall under its maritime jurisdiction, the Court will apply Minnesota substantive law to those claims.[8]

---

[7] It is true that, generally speaking, "[w]ith admiralty jurisdiction comes the application of substantive admiralty law." *E River S.S. Corp.*, 476 U.S. at 864.  But courts do not "synchronize the jurisdictional enquiry with the test for determining the applicable substantive law" because doing so "would discard a fundamental feature of admiralty law, that federal admiralty courts sometimes do apply state law." *Grubart*, 513 U.S. at 546.

[8] The parties do not argue that any state's law other than Minnesota's should apply.

III.   **GRAND RIVER'S MOTION FOR SUMMARY JUDGMENT**

Grand River moves for summary judgment on its crossclaim for indemnity against WCL, asserting that the doctrine of implied warranty of workmanlike service requires WCL to indemnify Grand River for losses suffered on WCL's dock.  WCL opposes Grand River's summary judgment motion, arguing that (1) the implied warranty claim fails because a contract did not exist between WCL and Grand River and (2) even if a contract had existed, Grand River is not entitled to indemnification because Grand River interfered with the performance of WCL's purported contractual duties.  The Court will deny Grand River's summary judgment motion because it is not entitled to *Ryan* indemnity.[9]

A.   **History of *Ryan* Indemnity**

Grand River argues that WCL must indemnify Grand River if it is found liable for Troy's injuries under *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co.*, 350 U.S. 124 (1956).  *Ryan* permits indemnification if a contractor breaches the implied warranty of workmanlike service.

Before turning to *Ryan*, the Court will define a few key terms and then provide an overview of the maritime legal landscape.

---

[9] As discussed in *infra* Section IV.B., the Court will grant WCL's motion for summary judgment to the extent Grand River seeks *Ryan* indemnity.

"Seamen" work on a vessel on navigable waters.[10]  "Longshoremen" (sometimes also referred to as dockworkers) are professionals who load, unload, and secure cargo on ships at ports.  *Longshoreman, Black's Law Dictionary* (12th ed 2024).  "Stevedores" can refer to either a "person or [a] company that hires longshore and harbor workers to load and unload ships."  *Stevedore, Black's Law Dictionary* (12th ed 2024).

Traditionally, if a seaman was injured during the course of their employment, maritime law recognized two causes of action: (1) maintenance and cure and (2) unseaworthiness.  *See Knight v. Alaska Trawl Fisheries, Inc.*, 154 F.3d 1042, 1044 (9th Cir. 1998).  A maintenance and cure claim "concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship."  *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001).  Under maintenance and cure, vessel owners are strictly liable for a seaman's injuries suffered in service of the vessel.  *Calmar S. S. Corp. v. Taylor*, 303 U.S. 525, 527 (1938).  The seaworthiness doctrine is grounded in the "vessel owner's duty to ensure that the vessel is reasonably fit to be at sea."  *Lewis*, 531 U.S. at 441.  The vessel owner's duty to provide a seaworthy ship is absolute and nondelegable, and therefore, "a shipowner is strictly liable" once the plaintiff shows that the unseaworthiness of the ship caused their injuries.  *Knight*, 154 F.3d at 1044.  Because

---

[10] "Under the Jones Act and the Longshore and Harbor Workers' Compensation Act, [a seaman is] a person who is attached to a navigating vessel as an employee below the rank of officer and contributes to the function of the vessel or the accomplishment of its mission." *Seaman*, *Black's Law Dictionary* (12th ed. 2024).

liability under these doctrines was absolute, a vessel's owner's negligence was irrelevant. *Id.* Apart from these two causes of action, until 1920, a seaman possessed no further right to recover from the shipowner for injuries suffered onboard.

In 1920, Congress changed this traditional framework by passing the Jones Act, which gave seamen the right to bring negligence actions against their employers. *Id.*[11]

In 1956, the Supreme Court in *Ryan* sought to remedy inequities created by traditional maritime law and several prior Supreme Court decisions. First, in *Seas Shipping Co. v. Sieracki*, the Supreme Court held that the unseaworthiness doctrine, which traditionally covered seamen, extended to longshoreman, noting that the doctrine "is not confined to seamen who perform the ship's service under immediate hire to the owner, but extends to those who render it with his consent or by his arrangement." 328 U.S. 85, 95 (1946). Several years later, the Supreme Court held that a shipowner could not seek contribution from the injured longshoreman's employer. *Halcycon Lines v. Haenn Ship Ceiling & Refitting Corp.*, 342 U.S. 282, 285 (1952). As a result, shipowners could be held liable for injuries to longshoremen caused by unseaworthy conditions on the vessel, even

---

[11] *See also Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995) ("Under general maritime law prevailing prior to the [Jones Act's] enactment, seamen were entitled to 'maintenance and cure' from their employer for injuries incurred 'in the service of the ship' and to recover damages from the vessel's owner for 'injuries received by seamen in consequence of the unseaworthiness of the ship,' but they were 'not allowed to recover an indemnity for the negligence of the master, or any member of the crew.'").

when those conditions were created not by the shipowner but rather by a third-party contractor.

In 1956, the Supreme Court in *Ryan* sought to correct this inequity after it was confronted with the question of whether a stevedoring contractor had to reimburse a shipowner for damages paid by the shipowner to one of the contractor's longshoremen on account of injuries suffered by the longshoreman in the course of his employment on ship. 350 U.S. at 125. In *Ryan*, a 3,200-pound roll of pulpboard broke loose and struck a longshoreman and injured him because the loading stevedore did not secure the roll properly. *Id.* at 126. The plaintiff then brought an action against the shipowner, who in turn sought indemnity from the plaintiff's employer, Ryan Stevedoring Co., with whom the shipowner had contracted to provide stevedoring services. *Id.* The Court inferred from the shipowner's contract with the stevedoring company an implied warranty of workmanlike service, which obliges the stevedoring company to complete its work "properly and safely." *Id.* at 134. At the same time, the Court read the contract as implicitly granting the shipowner a right to indemnification from the stevedore for losses arising from a breach of this warranty. *Id.* at 133–34. In other words, under *Ryan*, a shipowner is entitled to indemnification from the stevedore if the stevedore breaches the implied warranty of workmanlike service.

Shortly after *Ryan*, the Court offered an escape hatch for contractors: A shipowner was entitled to indemnity only "absent conduct on its part sufficient to preclude

recovery." *Weyerhaeuser S.S. Co. v. Nacirema Operating Co.*, 355 U.S. 563, 567 (1958). Around that same time, the Court also held that shipowner was entitled to indemnity from the stevedore company, even though neither party acted negligently, when defective equipment brought on board by the stevedore caused a longshoreman's injuries. *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 324 (1964). In doing so, the Court acknowledged that "liability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury. Where, as here, injury-producing and defective equipment is under the supervision and control of the stevedore, the shipowner is powerless to minimize the risk; the stevedore is not." *Id.*

Then in 1972, Congress amended the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.*, which barred seaworthiness actions by longshoreman against shipowners as well as indemnity actions by shipowners against contractors (e.g., stevedores) based on breaches of express or implied warranties that caused injuries to longshoremen. *See* 33 U.S.C. § 905(b). In other words, as a result of the 1972 LHWCA amendments, **longshoremen** could not bring unseaworthiness claims under *Sieracki*, and shipowners could not seek indemnification under *Ryan* from contractors arising from claims by longshoremen. *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 262 (1979) (recognizing that the LHWCA amendments effectively overruled *Sieracki* and *Ryan*).

-19-

Despite the 1972 LHWCA amendments, courts have recognized that a shipowner may be entitled to *Ryan* indemnity in **seamen** cases. *See, e.g.*, *Knight*, 154 F.3d at 1045 ("This and other circuits, however, have recognized the continued vitality of *Ryan* indemnity in seamen cases.").

### B.       Applicability of *Ryan* Indemnity

To determine whether Grand River is entitled to summary judgment, the Court must determine whether *Ryan* indemnity is appropriate in this case. The Court concludes the Grand River is not entitled to *Ryan* indemnification for two independent reasons. First, *Ryan* requires that a shipowner be a party to a contract or a third-party beneficiary to a contract. Because Grand River has failed to show that there is no genuine dispute of material fact that it is a party to a contract or a third-party beneficiary, *Ryan* is inapplicable. Second, because Troy asserts a Jones Act negligence claim, *Ryan* indemnity is not appropriate, and comparative fault principles should apply.

#### 1.       *Ryan*'s Contract Requirement

Grand River asserts that WCL should indemnify it for Troy's claims because *Ryan* indemnity does not require an express, written contract between the shipowner and dock owner. WCL argues that *Ryan* indemnity does not apply unless a contract exists. Despite a potentially conflicting holding in the Sixth Circuit, the Court concludes that *Ryan* indemnity requires a contract. Because Grand River has failed to show that there is no genuine dispute of material fact that it is a party to a contract or a third-party beneficiary to a contract, Grand River is not entitled to *Ryan* indemnity.

a.    *Olgebay*

Grand River relies on the Sixth Circuit case, which stated—in a footnote—that a contract is **not** required for *Ryan* indemnity. *Oglebay Norton Co. v. CSX Corp.*, 788 F.2d 361, 364 n.4 (6th Cir. 1986) ("A contractual relationship, however, is not considered an essential element to imply this warranty."). Although courts have sent mixed signals on whether a contract is required for a shipowner to seek *Ryan* indemnity from a stevedore, the Court concludes that *Oglebay* is mistaken on this point because it misreads another United States Supreme Court case, *Waterman S.S. Corp v. Dugan & McNamara, Inc.*, 364 U.S. 421 (1960). Explaining that conclusion, however, requires further discussion.

In *Ryan*, the Supreme Court read a warranty of workmanlike service into an existing contract between the shipowner and a stevedore. *Ryan*, 350 U.S. at 133. The Court then implied that the shipowner possessed a right of indemnification against the stevedore for damages caused by the stevedore's breach of the warranty.[12]  *Id.*  In doing so, the Court noted that the implied warranty "is **not** a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of petitioner's stevedoring contract." *Id.* (emphasis added) The Court also emphasized that the "shipowner's action here is not founded upon a tort . . . . The third-party complaint is grounded upon the

---

[12] "The shipowner here holds [the stevedore's] uncontroverted agreement to perform all of the shipowner's stevedoring operations at the time and place where the cargo in question was loaded.  That agreement necessarily includes [the stevedore's] obligation not only to stow the pulp rolls, but to stow them properly and safely." *Ryan*, 350 U.S. at 133.

contractor's breach of its purely consensual obligation." *Id.* at 131.  On its face, a contract appears to be essential under *Ryan*.  This proposition is further bolstered by the fact that the Court declined to address whether the implied warranty created a "non-contractual right of indemnity."  *Id.* at 133 (noting that because the shipowner's claim rested on the stevedore's contractual duties, the Court declined to address "the question of a noncontractual right of indemnity").

Despite the emphasis by the Supreme Court in *Ryan* on the contractual nature of the implied warranty, the Sixth Circuit stated in *Oglebay* that a contract is not required.[13]

---

[13] The facts in *Olgebay* bear some resemblance to the facts presented in this case.  In *Oglebay*, the shipowner sought indemnity from the dock owner after a seaman was fatally crushed between the *Sylvania*, a vessel owned by Oglebay Norton, and a dock owned by Chesapeake & Ohio Railway (C&O) during mooring operations in a storm-related power outage. 788 F.2d at 362–63.  The *Sylvania* had been instructed to dock at an unlit, coal-covered pier that lacked emergency lighting.  *Id.* at 363.  The dock featured two tiers: the upper tier served as the main deck, while the lower tier—three feet below and only a few feet wide—contained the mooring spiles.  *Id.*  No ladders or handrails connected the two levels, requiring seamen to step down from the upper to the lower tier to secure the vessel.  *Id.*  Because the dock was fitted with coal unloading machinery, coal routinely accumulated on its surface, and at the time of the incident, C&O had not swept the dock.  *Id.*  Combined with the storm's moisture, the coal-covered dock was wet and slippery.  *Id.*  As the *Sylvania* approached, the seamen and another crew member were lowered to the upper dock to handle the mooring lines.  *Id.*  Although the ship's floodlight initially illuminated their work area, the hull soon cast a shadow over the lower tier, and no one adjusted the light or provided assistance.  *Id.*  When the seaman stepped down to the lower level, he slipped, fell into the narrow gap between the dock and the vessel, and was crushed as the ship moved against the dock.  *Id.*  The seamen's estate brought a wrongful death claim under the Jones Act.  Oglebay settled the matter and sought indemnification from C&O, the dock owner.  *Id.*

The district court concluded that the dock owner breached its implied warranty of workmanlike performance but denied indemnity, holding that the *Sylvania*'s captain was primarily responsible for the seamen's death because he failed to provide sufficient lighting and proceeded to dock without adequate lighting.  *Id.* at 363.  The district court also determined that

-22-

788 F.2d at 364 n.4 ("A contractual relationship, however, is not considered an essential element to imply this warranty." (citing *Waterman*, 364 U.S. 421)).  The Court disagrees with *Oglebay* that *Waterman* dispensed with the contract requirement.

In *Waterman*, a longshoreman, who was employed by a stevedore, was injured on a ship while unloading it.  *Waterman*, 364 U.S. at 422.  The longshoreman brought an action against the shipowner.  *Id.*  The shipowner settled its lawsuit with the longshoreman.  *Id.*  But the shipowner, by way of a third-party complaint, sought indemnification from the stevedore.  *Id.*  The stevedore argued that it was not required to indemnify the shipowner because there was "no direct contractual relationship" between the stevedore and the shipowner.  *Id.*  At trial, the parties stipulated that stevedore and the shipowner did not have a contract because it "appear[ed] that the consignee of the cargo, not the [shipowner], had actually engaged the [stevedore] to unload the ship."  *Id.*  The district court then directed a verdict in favor of the stevedore, "holding that a shipowner had no right of indemnity against a stevedore under the circumstances alleged in the absence of a direct contractual relationship between them."

---

the captain was aware of the dock's hazards "and was in a better position to avoid the injury than the wharfinger." *Id.* at 364.

The Sixth Circuit reversed, concluding that Oglebay was entitled to indemnity under *Ryan* because the warranty of workmanlike service exists between the shipowner and a maritime contractor in the absence of any contract whatsoever. *Id.* at 364 n.4, 367.

*Id*. at 422–23.  The Third Circuit affirmed.  *Id.* at 423.  The Supreme Court reversed,

explaining that:

> In the Ryan and Weyerhaeuser cases considerable emphasis was placed upon the direct contractual relationship between the shipowner and the stevedore.  If those decisions stood alone, it might well be thought an open question whether such contractual privity is essential to support the stevedore's duty to indemnify.  But the fact is that this bridge was crossed in the Crumady case.  There we explicitly held that the stevedore's assumption of responsibility for the shipowner's damages resulting from unsafe and improper performance of the stevedoring services was unaffected by the fact that the shipowner was not the party who had hired the stevedore.  That case was decided upon the factual premises that the stevedore had been engaged not by the shipowner, but by the party operating the ship under a charter.

*Id.* at 423–24.  The *Waterman* Court then quoted the following passage from the

Supreme Court's decision in *Crumady* in support of its holding:

> We think this case is governed by the principle announced in the Ryan case.  The warranty which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not.  **That is enough to bring the vessel into the zone of modern law that recognizes rights in third-party beneficiaries**.  Moreover, as we said in the Ryan case, "competency and safety of stowage are inescapable elements of the service undertaken."  They are part of the stevedore's "warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product."  We conclude that since the negligence of the stevedores, which brought the unseaworthiness of the vessel into play, amounted to a breach of the warranty of workmanlike service, the vessel may recover over.

*Id.* at 424 (citations omitted) (quoting *Crumady v. The Joachim Hendrik Fisser*, 358 U.S.

423, 428–29 (1959)).

Applying the *Crumady* rationale, the Supreme Court concluded that a stevedore had a duty to indemnify the shipowner. *Waterman*, 364 U.S. at 424 ("We can perceive no difference in principle, so far as the stevedore's duty to indemnify the shipowner is concerned, whether the stevedore is engaged by an operator to whom the owner has chartered the vessel or by the consignee of the cargo.") Yet the Sixth Circuit in *Oglebay* cited *Waterman* to support the proposition that the warranty of workmanlike service exists between the shipowner and a third-party in the **absence** of a contractual relationship. *Oglebay*, 788 F.2d at 364 n.4.

The Court concludes that *Oglebay*'s contention that *Waterman* dispensed with the contract requirement entirely is erroneous. Instead, *Waterman* and *Crumady* held that the implied warranty of workmanlike service also arises when shipowner is **third-party beneficiary** to a contract.[14]  *Waterman*, 364 U.S. at 425 ("The owner, no less than the

---

[14] Another problem with *Oglebay* is that the Sixth Circuit relied on *Sims*, another Sixth Circuit case, which appeared to plant the seed that a contract is immaterial to the existence of the implied warranty.  In *Oglebay*, the court noted that the implied warranty of workmanlike service extends from a dock owner to a shipowner, as the warranty implies a "duty to furnish a safe means of egress and ingress to berthed ships."  *Id.* at 365 (quoting *Sims v. Chesapeake & Ohio Ry. Co.*, 520 F.2d 556, 561 (6th Cir. 1975)).

In *Sims*, the Sixth Circuit implied that *Ryan* did not impose a contract requirement. Instead, the implied warranty of workmanlike service simply depended on "the nature of the services performed by the wharfinger." 520 F.2d at 561.  In support of this proposition, the Sixth Circuit relied on a Fifth Circuit case, *Dow Chem.Co. v. Barge UM-23B*, which held that the wharfinger was required to indemnify barge owners and operators after two barges broke away and damaged a third party's dock because the contractor "breached its duty under the **contract**" with such owners and operators by acting negligently.  424 F.2d 307, 311 (5th Cir. 1970) (emphasis added).  It thus appears that *Sims* failed to acknowledge that the wharfinger contracted with the barges' owners and operators.

ship, is the **beneficiary** of the stevedore's warranty of workmanlike service." (emphasis added)); *Crumady*, 358 U.S. at 428 (emphasizing that because the warranty "is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not[,]" the vessel is covered by the warranty as a third-party beneficiary).[15]

*Waterman* did not dispose of the contract requirement entirely; rather, it recognized that *Ryan* indemnity may also apply when the shipowner is a third-party beneficiary to a contract. Accordingly, the warranty of workmanlike service is implied when a contract exists between the shipowner and the contractor or when the shipowner is a third-party beneficiary to a contract.

### b.     Application

Having concluded that *Ryan* indemnity requires either the existence of a contract between the shipowner and the contractor or that the shipowner be a third-party

---

*Olgebay* also cites *Ammesmaki v. Interlake S.S. Co.*, 342 F.2d 627, 631 (7th Cir. 1965). *Oglebay*, 788 F.2d at 365. In *Ammesmaki*, the Seventh Circuit held that a dock owner was required to indemnify a shipowner for injuries that occurred on the dock because the dock owner breached the implied "warranty to maintain the dock in a reasonably safe manner." 342 F.2d at 632. But unlike *Oglebay*, a contract was involved in *Ammesmaki*. *Id.* at 630 (noting that the shipowner "predicated its action for indemnity on alternative theories of tort and contract" and the contract theory was submitted to the jury to consider factual issues "includ[ing] whether the railroad expressly or impliedly had agreed to keep its dock in a reasonably safe condition"). Again, *Olgebay* appears to disregard the fact that the implied warranty claim was based on a contract.

[15] *See also In re Frescati Shipping Co.*, 718 F.3d 184, 198 (3d. Cir. 2013) (acknowledging that under *Crumady* and *Waterman*, "vessels are automatic third-party beneficiaries of warranties of workmanlike service made to their charterers by stevedores who unload vessels at docks").

-26-

beneficiary of a contract, the Court must determine whether Grand River has shown that there is no genuine dispute of material fact as to whether it was a party to a contract or a third-party beneficiary to one.  First, it is undisputed that WCL and Grand River were not parties to a written contract.  (Masterson Decl. ¶ 2, Exs. F, G.)  Grand River asserts that Grand River and WCL formed a contract because Grand River was an invitee on WCL's dock, which "included negotiations regarding time and process."  (Grand River's Reply Mem. Supp. Mot. Summ. J. at 5, July 7, 2025, Docket No. 71.)  WCL argues that a contract is not formed merely because WCL granted Grand River permission to dock.

The flaw in Grand River's argument is that it rests on its status as an invitee—a concept from tort law, not contract law.  Under either Minnesota or general maritime law, the elements of contract formation are (1) an offer, (2) acceptance, and (3) consideration—regardless of whether the purported contract is written or oral.  *See Taxi Connection, v. Dakota, Minn. & E. R.R. Corp.*, 513 F.3d 823, 826 (8th Cir. 2008); *In re Tasch, Inc.*, 46 F. App'x 731, 2002 WL 1973464, at *4 (5th Cir. 2002).  Grand River's purported status as an invitee has no bearing on whether these elements are met.  Because Grand River has not shown that it is a party to a contract, Grand River is not entitled to *Ryan* indemnity, unless it can show that it is a third-party beneficiary to a contract.

Grand River argues that it is a third-party beneficiary to any contracts WCL may have had with another party concerning the loading and delivery of the taconite pellets. The problem with Grand River's argument is that it points to no specific contract that WCL

may have had with another party.  As a result, the Court cannot assess whether Grand

River was a third-party beneficiary to a particular contract.  Grand River's position is also

undermined by evidence that Grand River was responsible for loading operations, a fact

that suggests that Grand River was not a beneficiary to a contract between WCL and some

other third-party contractor (e.g., a stevedore).

Accordingly, the Court concludes that Grand River is not entitled to summary

judgment on the issue of *Ryan* indemnity because it cannot show that, as a matter of law,

it was a party to a contract with WCL or that it was third-party beneficiary to a contract

WCL had with another party.

### 2.    Relationship Between *Ryan* Indemnity, Traditional Maritime Tort Claims, and Comparative Fault

Even if Grand River later shows that it is a party to a contract or a third-party

beneficiary to a contract, Grand River is not entitled to *Ryan* indemnity.[16]  The Court

concludes that *Ryan* indemnity does not apply when the plaintiff's claim is based on

negligence, and when the plaintiff brings a negligence claim, comparative fault principles

apply.  Because Troy asserts a negligence claim, *Ryan* indemnity is inappropriate, and

---

[16] WCL argues that *Ryan* is inapplicable because Troy did not bring a seaworthiness claim. Grand River argues that *Ryan* indemnity should nonetheless apply because Troy brings a claim for maintenance and cure, a claim for which Grand River is strictly liable.  After careful consideration, the Court concludes that it need not resolve the question of whether a seaworthiness claim (or a maintenance and cure claim, for that matter) is essential to invoke *Ryan* indemnity.  Instead, for the reasons set forth in this section, the proper inquiry centers on whether the plaintiff has asserted negligence claim.

comparative fault principles should therefore apply.  To explain why the Court reaches this conclusion, the Court must discuss the relationship between *Ryan* indemnity, traditional maritime tort claims, and comparative fault principles.

Under the seaworthiness doctrine, a shipowner has an absolute, nondelegable duty to provide a seaworthy ship, and is strictly liable for breaching this duty.  *Knight*, 154 F.3d at 1044.  The Ninth Circuit has stated that if a seaman raises a Jones Act negligence claim, a negligent shipowner is not entitled to *Ryan* indemnity from a maritime contractor because "*Ryan* indemnity was tied to the seaworthiness doctrine."  *Knight*, 154 F.3d at 1045 (recognizing that the Ninth Circuit has "never allowed . . . a negligent shipowner to obtain *Ryan* indemnity outside the seaworthiness doctrine"); *California Home Brands, Inc. v. Ferreira*, 871 F.2d 830, 836 (9th Cir. 1989) ("Since Jones Act suits are based on negligence, not any absolute duty of the shipowner, the rationale for implying a warranty of workmanlike performance does not apply here.").  On their face, *Knight* and *California Home Brands* emphasize the relationship between *Ryan* indemnity and seaworthiness claims, which are subject to strict liability.  If *Ryan* indemnity is inextricably connected with seaworthiness claims, then Grand River is not entitled to indemnification because Troy has not brought a seaworthiness claim.

Tacitly recognizing this issue, Grand River argues that the inquiry should center on whether Grand River is subject to strict liability.  Grand River relies on *Campbell Industries, Inc. v. Offshore Logistics International, Inc.*, a Ninth Circuit case, which held that a

shipowner was entitled to *Ryan* indemnity from a negligent contractor after it paid

maintenance and cure benefits to an injured seaman. 816 F.2d 1401 (9th Cir. 1987). Grand

River's point is well-taken. But *Campbell* differs from the case here in a critical way: Troy

has also asserted a Jones Act negligence claim against the shipowner, Grand River.[17]

Courts are divided on whether a negligent shipowner can secure *Ryan* indemnity

for its own negligence and breach of the warranty of seaworthiness. *Knight*, 154 F.3d at

1046. On one hand, several circuits still recognize *Ryan* indemnity, even when the

shipowner shares some degree of fault—reasoning that the contractor is in a better

position to avoid the incident than the shipowner.[18] On the other hand, some courts have

applied comparative fault principles in seamen personal injury cases, rejecting *Ryan*

indemnity.[19] In *Knight*, the Ninth Circuit adopted the reasoning of the courts electing to

apply comparative fault—where the plaintiff brought claims for unseaworthiness,

---

[17] *See Knight*, 154 F.3d at 1045 (distinguishing *Campbell* on the ground that the injured seamen there did not assert a Jones Act negligence claim against the shipowner, and the shipowner was not at fault for their injuries).

[18] *See, e.g.*, *Cooper v. Loper*, 923 F.2d 1045, 1051 (3d. Cir. 1991) (applying *Ryan* indemnity even when shipowner was 20 percent at fault); *Oglebay*, 788 F.2d at 366 (applying *Ryan* indemnity even when shipowner was 75 percent at fault); *Farrell Lines, Inc. v. Carolina Shipping Co.*, 509 F.2d 53, 54 (4th Cir. 1975) (applying *Ryan* indemnity even when shipowner was 25 percent at fault).

[19] *See Knight*, 154 F.3d at 1046; *Smith & Kelly Co. v. S/S Concordia TADJ*, 718 F.2d 1022, 1025, 1028–29 (11th Cir. 1983); *Loose v. Offshore Navigation, Inc.*, 670 F.2d 493, 500 (5th Cir. 1982); *Black v. Red Star Towing & Transp. Co.*, 860 F.2d 30, 34 (2d Cir. 1988).

maintenance and cure, and Jones Act negligence—and held that "a negligent shipowner is not entitled to receive *Ryan* indemnity from a negligent contractor when the shipowner is found liable under both negligence and unseaworthiness theories." 154 F.3d at 1047.[20] Although the Eighth Circuit has not opined on this issue, the Court concludes that the latter approach is the proper one, and comparative fault principles should be applied when an injured seamen asserts a Jones Act negligence claim for at least four reasons.

**First,** *Ryan* indemnity sought to remedy a specific inequity—allowing a faultless shipowner to recover from a negligent contractor the damages the shipowner was compelled to pay to an injured party. *See Knight*, 154 F.3d at 1046. Therefore, it stands to reason that *Ryan* indemnity should not apply if the shipowner is at fault.[21] Here, it is possible that Grand River will be held liable for Jones Act negligence, as that claim is presently is preserved for trial.

---

[20] In *Smith & Kelly*, an Eleventh Circuit case, a seaman was injured because of both the shipowner and stevedore's negligence. 718 F.2d at 1028. The court refused to apply *Ryan* because "the original justification for *Ryan* indemnity [did not apply] to controversies involving seamen injured at sea." *Id.* In a subsequent case, the Eleventh Circuit clarified that unlike pier-side accidents "where contractors are better positioned to avoid injuries during cargo operations, shipowners are best able to protect seamen from injuries aboard ship while at sea." *Vierling v. Celebrity Cruises, Inc.*, 339 F.3d 1309, 1317–18 (11th Cir. 2003) (cleaned up). The *Vierling* court then held that *Ryan* indemnity applied when a passenger was injured on the gangway connecting the pier to the ship, reasoning that the port authority—not the shipowner—was in a better position to avoid the accident. *Id.* at 1318. At first blush, *Vierling* supports Grand River; however, *Vierling* is distinguishable because the shipowner contracted with the port authority to provide passengers with a means of boarding the ship. *Id.* at 1316. Whereas here, there is a genuine dispute of material fact as to whether a contract exists between WCL and Grand River.

[21] For reasons discussed below, there is a genuine dispute of material fact as to whether Grand River was negligent.

**Second**, allocating liability according to comparative fault most effectively serves the objectives underlying *Ryan*. *Id*. The *Ryan* doctrine primarily sought to promote safety by assigning responsibility to the party best positioned to prevent accidents, thereby incentivizing that party to take steps to avoid such accidents. *Id.* *Ryan*'s goal of accident avoidance is advanced by imposing a duty on "all responsible parties to exercise reasonable care." *Id*; *see also Smith & Kelly Co. v. S/S Concordia TADJ*, 718 F.2d 1022, 1029 (11th Cir. 1983) ("[A] system which imposes complete liability on the party best able to avoid accident in each case provides little incentive for the other party to take prophylactic steps.").

**Third**, comparative fault prevents the injustice created by *Ryan*. That is, a non-negligent party may be required to indemnify the negligent party because *Ryan* indemnity does not depend on fault. *Knight*, 154 F.3d at 1046–47 (noting that comparative fault principles prevent the situation where the shipowner, who was 35 percent at fault, is required to pay "all of the damages under the seaworthiness doctrine or none of the damages under *Ryan*").

**Fourth**, the comparative fault approach more closely aligns with U.S. Supreme Court precedent, which has adopted comparative fault principles in other maritime cases. *See Knight*, 154 F.3d at 1047 (collecting Supreme Court cases in which the Court endorsed the application of comparative fault principles in maritime cases).

In sum, the Court declines to address whether *Ryan* indemnity may be applied in the absence of a seaworthiness or maintenance and cure claims.  The Court, however, concludes that when an injured seaman asserts a Jones Act negligence claim, comparative fault principles should apply—even if the shipowner is also subject to a strict liability claim, such as seaworthiness or maintenance and cure.  If Grand River is found strictly liable for maintenance and cure, it may be entitled to reimbursement from WCL in an amount proportionate to its share of fault.  *See Black v. Red Star Towing & Transp. Co.*, 860 F.2d 30, 34 (2d Cir. 1988) (denying *Ryan* indemnity due to absence of contractual relationship but applying comparative fault under equity principles and thus requiring the contractor to reimburse the shipowner for maintenance and cure benefits paid to the injured seamen).

*   *   *

The Court will deny Grand River's motion for summary judgment on its indemnity claim for two independent reasons.  First, there is a genuine issue of material fact as to whether Grand River is a party to a contract or is otherwise a third-party beneficiary to a contract.  The *Oglebay* case, which is cited by Grand River for the proposition that contracts are not essential to a *Ryan* indemnity claim, misreads the holding of U.S Supreme Court precedent.  Second, even if Grand River later shows that it is party to a contract or a third-party beneficiary to a contract at trial, Grand River is not entitled to *Ryan* indemnity because Troy is asserting a Jones Act negligence claim; as a result, a

-33-

comparative fault approach is more appropriate and reflects the broader trend in maritime law to apply comparative fault principles in seamen personal injury cases. The Court will, therefore, deny Grand River's summary judgment motion seeking indemnity from WCL to the extent that the indemnity claim is based on *Ryan*.[22]

## IV.    WCL'S MOTION FOR SUMMARY JUDGMENT

WCL faces claims on two fronts. Troy asserts claims against WCL for negligence, premises liability, and for breach of implied warranty of workmanlike service. (Am. Compl. ¶¶ 21–34.) Grand River asserts a crossclaim against WCL seeking contribution and indemnity. (Grand River's Answer at 8–9.) Likewise, WCL brings a crossclaim against Grand River for contribution and indemnity. (WCL's Answer ¶¶ 42–43, Oct. 26, 2023, Docket No. 9.) WCL moves for summary judgment on all claims, except its own crossclaim against Grand River for contribution and indemnity. (Docket No. 58.) The Court will address each claim in turn.

---

[22]  Because the Court concludes that *Ryan* indemnity is inappropriate, the Court need not address WCL's argument that Grand River engaged in conduct sufficient to preclude recovery. *See Weyerhaeuser S.S. Co. v. Nacirema Operating Co.*, 355 U.S. 563, 567 (1958) (A shipowner is entitled to Ryan indemnity only "absent conduct on its part sufficient to preclude recovery.").

A.      Troy's Claims Against WCL

1.      Premises Liability and Negligence Claims

WCL contends that Troy's premises liability and negligence claims fail as a matter of law because (1) Troy fails to show that WCL breached its duty to Troy or caused his injuries and (2) the risks of walking on taconite pellets were known and obvious.[23]

"A dock owner's duty to seamen using the dock is defined by the application of state law, and not maritime law." *Westewald v. Foss Mar. Co.*, 319 F. Supp. 2d 1002, 1009 (N.D. Cal. 2004) (citing *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 206–07 (1971)).  Under Minnesota law, to establish a prima facie case of negligence, the plaintiff must demonstrate: "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of the duty being the proximate cause of the injury."  *Gradjelick v. Hance*, 646 N.W2d 225, 230 (Minn. 2002).  If "the record reflects a complete lack of proof on any element," summary judgment must be granted to the defendant.  *Oien v. Home Depot U.S.A., Inc.*, 69 F.4th 487, 490 (8th Cir. 2023) (internal quotation marks omitted). With respect to a premises liability negligence claim, a landowner owes a duty "to use reasonable care for the safety of all such persons invited upon the premises, regardless

---

[23] Because the Court exercises supplemental jurisdiction over Troy's premises liability and negligence claims against WCL, the Court will cite to Minnesota law.  That said, the elements of negligence are essentially the same under both maritime law and Minnesota law.  *Compare Gradjelick v. Hance*, 646 N.W2d 225, 230 (Minn. 2002) (listing elements of negligence under Minnesota law), *with Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (listing negligence elements under maritime law).  The Court's conclusions at this stage are therefore unaffected by any choice-of-law determinations.

of the status of the individuals." *Foss v. Kincade*, 766 N.W.2d 317, 320 (Minn. 2009). This "duty of reasonable care is modified according to the expected use of the land." *Id.* at 321.

### a.    Breach and Causation

WCL asserts that Troy's negligence and premises liability claims fail as a matter of law because he cannot establish the elements of breach and causation. Because there is a genuine dispute of material fact as to whether WCL breached its duty owed to Troy and caused Troy's injuries, WCL's motion for summary judgment on these claims will be denied.

WCL's argument is that, since it is undisputed that taconite was falling from the overhead chutes as Troy walked toward the ship, the condition of the dock was continuously changing. And because of the dock's changing condition, WCL reasons that Troy cannot establish that Troy slipped due to WCL's failure to sweep the dock. In support of this argument, WCL relies on Captain Lees's testimony in which he observed that taconite "pellets were actively falling" from above when he arrived at the scene and that the dock's conditions were constantly changing as a result. (*See* Lees Dep. at 28.) Captain Lees further testified that because pellets continued to fall, he could not opine on the dock's condition at the time Troy fell.

The problem with WCL's argument is that it fails to cure a factual dispute central to this case: did Troy slip on taconite pellets that were not swept after the *Arthur Anderson* departed, pellets that fell from the loading chutes overhead, or a combination?

-36-

It undisputed that WCL personnel could not finish sweeping due to the *Astabula's* arrival. It is also undisputed that WCL's failure to finish sweeping the dock violated its own policy. The fact that taconite pellets were actively falling and Captain Lees could not speculate as to the dock's condition at the time of Troy's accident does not resolve the question of whether Troy slipped on taconite pellets left over from the *Arthur Anderson* or pellets that fell during *Ashtabula's* loading operations.

Nor is this factual dispute resolved by evaluating who was responsible for the falling taconite pellets.  Although WCL was responsible for sweeping the dock, the record reflects that Grand River was responsible for loading operations.  (*See* Brewer Dep. 31–32.)  Assuming Grand River is responsible for loading operations, the question of who was responsible for the taconite pellets on which Troy slipped would remain.

Accordingly, the Court will deny WCL's motion for summary judgment with respect to Troy's negligence and premises liability claims because there is a genuine dispute of material fact regarding who was responsible for the taconite pellets that caused Troy to slip and fall.  The Court concludes that a reasonable jury could find that WCL breached its duty to Troy and that this breach caused his injuries.

### b.   Known and Obvious Hazard

As noted above, to establish a premises liability negligence claim, a plaintiff must show that the landowner owed a duty "to use reasonable care for the safety of all such persons invited upon the premises, regardless of the status of the individuals."  *Foss*, 766 N.W.2d at 320.  Although a "landowner generally has a continuing duty to use reasonable

care for the safety of all entrants," the duty "is not unlimited." *Senogles v. Carlson*, 902 N.W.2d 38, 42 (Minn. 2017). If the "danger is known or obvious," the landowner is not liable "unless the possessor should anticipate the harm despite such knowledge or obviousness." *Id.* (quoting *Peterson v. W.T. Rawleigh Co.*, 144 N.W.2d 555, 557–58 (Minn. 1966).[24] Stated differently, WCL may be held liable for Troy's injuries arising from a condition on WCL's dock, except if the danger was known and obvious to Troy, unless WCL should have anticipated the harm to Troy.

The test for whether a condition is "known" is subjective, and this test is satisfied if the entrant actually recognized the danger and appreciated the "probability and gravity of the threatened harm." *Id.* at 44 (quoting Restatement (Second) of Torts § 343A cmt. b (Am. Law. Inst. 1965)). The test for whether a danger is "obvious" is objective, and this test is satisfied if "both the condition and the risk are apparent to and would be recognized by a reasonable [person] in the position of the visitor." *Id.* (alteration in original) (internal quotation marks and citation omitted).

WCL will be liable for known and obvious dangers if it "should anticipate the harm despite such knowledge or obviousness." *Id.* at 47. This requirement assesses whether it was foreseeable that Troy would proceed to encounter the danger. *Id.* To assess

---

[24] Minnesota courts have usually stated that the existence of a legal duty is a question of law. *See, e.g.*, *Foss v. Kincade*, 766 N.W.2d 317, 320 (Minn. 2009). But in *Senogles*, the Court concluded that question of whether the danger was obvious was question of disputed fact for the jury to decide. 902 N.W.2d at 47.

foreseeability, courts "look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility." *Id.* (quoting *Foss*, 766 N.W.2d at 322). A reason to anticipate the harm may arise when the landowner "has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk." *Sutherland v. Barton*, 570 N.W.2d 1, 7 (Minn. 1997) (quoting Restatement (Second) of Torts § 343A cmt. f (Am. Law Inst. 1965)).

WCL argues that (1) Troy was aware that he was encountering taconite in a dimly lit area, but despite these conditions, Troy continued to proceed to the ship and that (2) WCL could not anticipate that Troy would walk on the dock because it provided an elevated catwalk as an alternative means of accessing the dock. The Court concludes there is a genuine factual dispute whether the "known and obvious" hazard exception should apply. The Court will first address whether the hazard was known and obvious, and then the Court will address whether WCL should have anticipated the harm to Troy.

**First**, there is a genuine factual dispute about whether the danger was known. On one hand, the record appears to demonstrate the Troy knew about the danger. It is undisputed that when Troy arrived at the dock, he asked a security guard for instructions on how to access the *Ashtabula*, and the security guard only instructed him "to walk towards the vessel." (Troy Dep. at 69.) The security guard did not mention the presence of taconite pellets. Despite this lack of direction, Troy proceeded to the ship, and he

recalled encountering taconite pellets right when he "walked underneath the unit." (*Id.* at 84.)  In fact, he recalled that the path was covered with "piles" and "single layers" of taconite pellets. (*Id.* at 84, 105.) He also testified that, as he walked, he had to pay careful attention to his foot placement because of the significant amounts of ore.  (*Id.* at 84) He explained that it felt like he was "walking on marbles" as pellets "roll[ed] underneath [his] feet." (*Id.* at 107.)  Taken together, these facts suggest that Troy, despite the lack of lighting, saw and felt significant amounts of taconite and recognized that the taconite pellets made it difficult to walk.

On the other hand, the record can be read to suggest that Troy did not appreciate the "probability and gravity" of the threat of harm posed the taconite pellets.  *Senogles*, 902 N.W.2d at 42.  Troy testified that area was poorly lit. (*Id.* at 103.)  He also testified that he did not recall whether he felt unsafe while walking on the ore-covered dock. (*Id.* at 86, 91–92, 108.)  Even after encountering the ore, Troy never felt compelled to return to the guard shack to seek clarification that he was taking the correct path. (*Id.* at 85–86.)  Taken together, these facts suggest that although Troy recalled encountering the ore, he did not fully appreciate the danger the taconite posed to his safety.

Because a reasonable jury could conclude that Troy did not appreciate the danger the taconite presented, WCL cannot show that the danger was known as a matter of law.

**Second**, there is a genuine factual dispute about whether the danger was obvious. On one hand, the record shows that a taconite-covered dock would present an obvious

-40-

risk that a reasonable person would recognize.  It is undisputed that WCL policy required that dock aprons be cleaned before each vessel's arrival.  (Weichseldorfer Dep. at 19–20.)  It is also undisputed that WCL's dock has a catwalk system which allows workers to traverse the dock without walking on the dock's surface.  (Johnson Dep. at 77–78.)  The workers are also trained to avoid walking under loading shuttle/chutes because material being loaded onto the ship, such as taconite, could fall and hit workers and could create a walking hazard on the dock.  (Kahn Dep. at 28–29.)

On the other hand, a reasonable jury could reach the opposite conclusion.  Troy testified that the area was poorly lit.  (Troy Dep. at 103.)  Nor did Troy observe any signage to direct Troy safely to the vessel.  (*Id.* at 218–19.)  Given the lack of lighting and signage, a reasonable jury could conclude that a reasonable person would not perceive the risk posed by the ore-covered dock, and therefore WCL cannot show that the danger was obvious as a matter of law.

**Third**, WCL argues that because the dock had an elevated catwalk system, WCL had no reason to anticipate that Troy would walk on the ore-covered dock.  The problem with WCL's argument is that the presence of a safer alternative (i.e., the catwalk) was not readily apparent; a reasonable jury could therefore conclude that it was foreseeable that Troy would walk on the ore-covered dock.  When Troy arrived at the facility, a security guard simply instructed "to walk toward the vessel."  (*Id*. at 69, 91.)  The security guard never mentioned a catwalk.  Nor did Troy recall anyone advising him of the catwalk's

-41-

existence.  (*Id.* at 122–23.)  Troy also testified that the dock was poorly lit and that the dock lacked signage—including signage directing him to the catwalk—that would help guide him safely to the vessel.  (*Id.* at 103, 218–19.)  In light of the record evidence, a reasonable jury could conclude that WCL should have anticipated this harm because it was foreseeable that Troy would proceed to encounter the risk.

*     *     *

Because there is a genuine dispute of material fact as to whether WCL breached its duty owed to Troy and caused Troy's injuries, WCL is not entitled to summary judgment on its negligence and premises liability claims.  There is also a genuine issue of material fact as to whether the danger was known and obvious to Troy.  Accordingly, the Court will deny WCL's motion for summary judgment as to Troy's negligence and premises liability claims against WCL.

### 2.    Implied Warranty of Workmanlike Service

Troy claims that WCL breached the implied warranty of workmanlike service.  WCL argues that it is entitled to summary judgment on this claim for three reasons.  First, no contract between WCL and Grand River exists.  Second, even if a contract existed, it cannot be invoked by Troy because plaintiffs do not need indemnity on their own claims. Third, the implied warranty does not apply since there is not a contribution bar or any strict-liability claims present here.

The Court will grant WCL's motion as to Troy's implied warranty claim because Troy is not a shipowner in need of the indemnity the implied warranty of workmanlike service

-42-

provides.  *See, e.g.*, *Knight*, 154 F.3d at 1044.  The Court will, therefore, grant WCL summary judgment as to Troy's implied warranty claim.

### B.   Grand River's Crossclaims Against WCL

Grand River asserts crossclaims against WCL seeking contribution and indemnity. (Grand River's Answer at 8–9.)  WCL moves for summary judgment on those crossclaims.

#### 1.   *Ryan* Indemnity

As explained in Section III, the Court concludes that comparative fault principles should be used to apportion fault, if any, between WCL and Grand River.  Accordingly, the Court will grant WCL's motion for summary judgment as to Grand River's claim for indemnity under *Ryan*, 350 U.S. 124.  To be clear, just because the Court will grant WCL's motion for summary judgment as to Grand River's *Ryan* indemnity claim, Grand River is not necessarily precluded from seeking contribution or some other type of indemnity at trial.  *See* T. Schoenbaum, 1 Admiralty & Maritime Law § 6.19 (7th ed.) (explaining that under the Jones Act and general maritime law, concurrent tortfeasors are generally entitled to contribution).[25]

#### 2.   Contribution

WCL argues that Grand River's claim for contribution against WCL fails as a matter of law because WCL is not at fault for Troy's injury.  For the reasons set forth in Section

---

[25] (*See also* WCL's Mem. Supp. Mot. Summ. J. at 17 (recognizing that if Court denies Grand River's *Ryan* indemnity claim, "Grand River is not barred from claiming contribution").)

IV.A.1.a., a genuine dispute of material fact exists as to whether WCL, Grand River, or some unidentified third party was responsible for the taconite pellets on the dock that caused Troy to slip and fall.  In addition, if WCL is found to be entirely or partially at fault, Grand River will have the right to seek contribution on Troy's maintenance and cure claim, which does not depend on Grand River's fault but on the contractual relationship between Grand River (the shipowner) and Troy (the seaman).  *See Adams v. Texaco, Inc.*, 640 F.2d 618, 619 (5th Cir. 1981) (holding that a negligent shipowner is entitled to contribution from a third-party tortfeasor whose negligence contributed to a seamen's injuries that resulted in the shipowner paying the seamen maintenance and cure benefits).

Accordingly, the Court will deny WCL's motion for summary judgment as to Grand River's contribution claim.

**CONCLUSION**

Grand River and WCL each filed motions for summary judgment.  First, Grand River moves for summary judgment on its crossclaim for indemnity against WCL under *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co.*, 350 U.S. 124 (1956).  The Court will deny Grand River's motion for summary judgment on its indemnity claim because there is a genuine dispute of material fact as to whether Grand River is a party to a contract or is otherwise a third-party beneficiary to a contract.  Even if Grand River is party to a contract or a third-party beneficiary to one, Grand River is not entitled to *Ryan* indemnity because Troy is

asserting a Jones Act negligence claim, and consequently, comparative fault principles should apply.  The Court will, therefore, deny Grand River's summary judgment motion.

Second, WCL moves for summary judgment on all claims filed against it.[26]  The Court will grant WCL's motion in part and deny it in part.  The Court will deny WCL's motion as to Troy's negligence and premises liability claims.  The Court will grant WCL's motion as to Troy's claim that WCL breached the implied warranty of workmanlike service.  The Court will grant WCL's motion as to Grand River's crossclaim to the extent Grand River's crossclaim relies on indemnity under *Ryan*.  Grand River is not precluded from seeking contribution or some other type of indemnity.  Finally, the Court will deny WCL's motion as to Grand River's crossclaim against WCL for contribution.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Grand River Navigation's Motion for Summary Judgment (Docket No [53]) is **DENIED**.

2. Defendant Wisconsin Central Ltd.'s Motion for Summary Judgment (Docket No [58]) is **GRANTED in part and DENIED in part**, as follows:

---

[26] WCL does not move for summary judgment on its own crossclaim against Grand River for contribution and indemnity.

a. Summary judgment is **DENIED** as to Plaintiff's negligence and premises liability claims (Counts 3 and 4).

b. Summary judgment is **GRANTED** as to Plaintiff's implied warranty of workmanlike service claim (Count 5).

c. Summary judgment is **GRANTED** as to Grand River's crossclaim against WCL to the extent such crossclaim seeks indemnity under *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co.*, 350 U.S. 124 (1956). Summary judgment is **DENIED** as to Grand River's crossclaim against WCL to the extent such crossclaim seeks contribution. Grand River is not precluded from seeking contribution or indemnity on grounds other than under *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co.*, 350 U.S. 124 (1956).

DATED: March 10, 2026
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge

-46-

**APPENDIX**

| | |
|---|---|
| Dep. of David Troy ("Troy Dep.") | • First Decl. of Vince C. Reuter ("First Reuter Decl.") ¶ 2, Ex. A, May 30, 2025, Docket No. 55: 68–70, 83–86, 92–94, 96–98, 102–108, 116–120, 135–137, 227.<br><br>• Decl. of Timothy Masterson ("Masterson Decl.") ¶ 2, Ex. A, May 30, 2025, Docket No. 60: 1–231.<br><br>• Decl. of Laura B. De La Cruz ("De La Cruz Decl.") ¶ 2, Ex. A, June 20, 2025, Docket No. 68: 69–70, 84–87, 97, 132–133, 136, 181, 218–220. |
| Dep. of George T. Brewer ("Brewer Dep.") | • First Reuter Decl. ¶ 3, Ex. B, Docket No. 55: 16–18, 21–23, 29–32, 34–36, 40–41, 46–48, 81.<br><br>• Masterson Decl. ¶ 2, Ex. C, Docket No. 60: 1–4, 13–16, 21–24.<br><br>• Second Decl. of Vince C. Reuter ("Second Reuter Decl.") ¶ 2, Ex. A, June 20, 2025, Docket No. 65: 23–25, 28–30, 37–39, 41–43, 45–47, 58–60, 74–77.<br><br>• De La Cruz Decl. ¶ 5, Ex. D, Docket No. 68: 1, 16, 20, 23–24, 38, 41–42, 46, 49–50, 58–59, 62, 65. |
| Dep of Louis H. Weichseldorfer ("Weichseldorfer Dep.") | • First Reuter Decl. ¶ 4, Ex. C, Docket No. 65: 15–18, 40–43, 49.<br><br>• Second Reuter Decl. ¶ 3, Ex. B, Docket No. 65: 1, 18–19, 40–43.<br><br>• De La Cruz Decl. ¶ 3, Ex. B, Docket No. 68: 14, 16–20, 23, 29, 34, 36, 44–45.<br><br>• Third Decl. of Vince C. Reuter ("Third Reuter Decl.") ¶ 2, Ex. A, July 7, 2025, Docket No. 72: 1, 18–21, 43–45, 49. |

| Dep. of Kevin M. Lees ("Lees Dep.") | • Masterson Decl. ¶ 2, Ex. B, Docket No. 60: 1–4, 9–16, 21–28, 33–36, 89–96.<br><br>• De La Cruz Decl. ¶ 4, Ex. C, Docket No. 68: 1, 10–14, 21–22, 28.<br><br>• Decl. of Alexandra Zabinski ("Zabinski Decl.") ¶ 2, Ex. A, June 20, 2025, Docket No. 70: 1–97. |
| Dep. of Eric Johnson ("Johnson Dep.") | • Masterson Decl. ¶ 2, Ex. D, Docket No. 60: 1, 32, 77–78 |
| Dep. of Kyle Kahn ("Kahn Dep.") | • Masterson Decl. ¶ 2, Ex. E, Docket No. 60: 1–4, 25–32.<br><br>• De La Cruz Decl. ¶ 7, Ex. F, Docket No. 68: 1, 14–15. |